# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

UNITED STATES OF AMERICA

-vs-                                               Case No.:  2:09-cr-75-FtM-29SPC

JASON BERGIN
ROBERT POWNER
CAREY BERGIN

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This matter comes before the Court on the Defendant Jason Bergin's Motion to Suppress Evidence (Doc. #92) filed on December 23, 2009.  The Government filed the Government's Response to Defendant's Motion to Suppress Evidence (Doc. #94) on December 4, 2009. Subsequently, the Defendant, Robert Powner (Defendant Powner), filed his Motion to Adopt Co-Counsel's Motion on Behalf of Jason Bergin to Suppress Evidence in Addition to Supplementing such Motion with Additional Facts and Case Law on Behalf of Co-Defendant Robert Powner (Doc. #110) filed on December 21, 2009.  On December 30, 2009, the Defendant, Susan M. Hamilton (Hamilton), filed her Motion to Adopt Defendant Jason Bergin's Motion to Suppress (Doc. #124).[1] The Government filed the Government's Response to Defendant's Motion to Suppress Evidence (Doc. #130) on December 31, 2009.  On December 31, 2009, the Defendant Shandy Albert (Albert)

_____

[1]On January 22, 2010, Susan Hamilton filed a Motion to Withdraw (Doc. #143) her Motion to Adopt Defendant Jason Bergin's Motion to Suppress.  On January 26, 2010, the Defendant Susan Hamilton entered a plea of guilty to Count one of the Indictment. (Doc. #149).

filed his Motion to Adopt Defendant Jason Bergin's Motion to Suppress (Doc. #131).[2] On January 27, 2010, the Defendant, Carey Bergin, filed her Motion to Adopt Jason Bergin's Motion to Suppress (Doc. #151).

An evidentiary hearing was scheduled before the undersigned United States Magistrate Judge on January 6, 2010. The hearing was continued until February 2, 2010 upon request of the parties because of recently received discovery materials.

A two-day evidentiary hearing was held before the undersigned on February 2 and 5, 2010. Defendant Jason Bergin was present and represented by CJA Counsel Charles Harris. Defendant Powner was present and represented by CJA Counsel Richard Lakeman, and Defendant Carey Bergin was present and represented by AUSPD Russell Rosenthal. The Government was represented by AUSA Nicole H. Waid.

At the hearing on February 2, 2010, the Government called Corey Roberts, Christopher Canfield, Pete Rodrigo, and Jamie Nolen. Defendant Powner testified as to the issue of his standing to challenge the search, and called two witnesses, April Campbell, and Joshua Abernathy. Defendant Carey Bergin called Angelique Bond. At the continuation of the hearing on February 5, 2010, the Government called Amber Baginski. Defendant Powner testified on his own behalf, and Defendant Carey Bergin called Manuel Vasile. Numerous items of evidence were entered by the Government and the Defense. (See Doc #s 166, 170, 175, 176, 177). The Transcript of the proceedings has been

---

[2] The Government filed the Government's Response as to Shandy Albert's Motion to Suppress Evidence (Doc. #134) on January 4, 2010. On January 19, 2010, the Defendant Shandy Albert filed a Notice of Withdrawal of his Motion to Adopt Defendant Jason Bergin's Motion to Suppress (Doc. #140). On February 9, 2010, Shandy Albert entered a plea of guilty to Count One of the Indictment. (Doc. # ).

filed in two Volumes: Volume I which includes the testimony of February 2, 2010, and Volume II which includes the testimony of February 5, 2010.[3]

**TESTIMONY AND EVIDENCE**

**Robert Powner (Vol. I, 9 - 39):**

Defendant Powner testifed that he was present at 20494 Sherrill Lane on July 27 and July 28. (Vol. I, 9:10-14). He had arrived around the 25th or 26th of July, left on the 28th to go to the hospital, returned on the 29th and stayed a couple more days. (Vol. I, 9:16-19 14:18-24). Defendant Powner testified that while at the residence he slept on a couch in Defendants Jason and Carey Bergin's bedroom. (Vol. I, 10:11-13, 11:3-6). He had his things on the couch, his pillow, glasses, cigarettes, hat, underclothes and socks. (Vol. I, 10:14-16, 11:13-22). He had his toothbrush in the bathroom. (Vol. I, 16:3-7). At other times, he stayed in the living room in the main trailer. While at the scene, he told the officers his residence was in Naples and he gave the EMT's his permanent address of 4975 Palmetto Court in Naples, FL. (Vol. I, 16:19-25, 17:1-2, 19:17-22).

**Dep. Corey Roberts (Vol. I, 39-93):**

Corey Roberts (Dep. Roberts) has worked with the Lee County Sheriff's Office (LCSO) for just under two years as a road patrol officer. (Vol. I, 40: 8-18). Dep. Roberts checked local records and recently issued warrants and saw Defendant Jason Bergin's name appear for two felony violations of probation warrants for obtaining a controlled substance by fraud. (Vol. I, 41:11-16).

Dep. Roberts along with Deputies Canfield and Foster responded to Defendant Jason Bergin's address at 20494 Sherrill Lane, Estero, Florida (the scene) at approximately 12:30 a.m. (Vol. I, 41:19-24, 42:15-17). He approached the south side of the residence where the screen door

---

[3]The transcripts will be referred to as Volume I (Vol. I, p:ll), and Volume II (Vol. II, p:ll).

was located.  (Vol. I, 52:8-10). There was a female, later identified as Francis Whaley standing on the porch.  (Vol. I, 52:8-12). She appeared to be hallucinating, talking to herself, mumbling, and staring.  (Vol. I, 52:14-15, 53:20-23). He opened the screen door, briefly spoke with her, and asked her to step outside for his safety and hers.  (Vol. I, 52:16-17). Dep. Roberts walked through the screen door and knocked on a sliding glass door to his left.  (Vol. I, 54:1-3). There were no lights on inside.  (Vol. I, 54:3). He waited briefly but no one came to the door.  (Vol. I, 54:3-4). He then proceeded forward to the other door that was on the porch and knocked on that door. (Vol. I, 54:4-6). There was a sign posted on the door of the residence.[4]  (Vol. I, 54:11-14). Defendant Powner opened the door and Dep. Roberts asked if he could speak with Jason.  (Vol. I, 54:19-20). Defendant Powner hesitated and gave him a blank look.  (Vol. I, 54:20-25). Defendant Jason Bergin poked his head around the corner to see who was at the door.  (Vol. I, 54:21-22). Dep. Roberts asked Defendant Jason Bergin to step to the door and advised him he had felony warrants and that he was under arrest. (Vol. I, 55:3-8). At that time, Dep. Canfield came onto the porch.  (Vol. I, 55:17-18). Dep. Roberts handcuffed Defendant Jason Bergin and checked the contents of his pockets. (Vol. I, 55:20-22).

Defendant Jason Bergin was wearing shorts and a T-shirt and asked if he could get some socks.  (Vol. I, 56:1-7). Dep. Roberts told him no that he was not allowed to go back inside.  (Vol. I, 56:9).  Defendant Jason Bergin was not allowed to re-enter the residence due to officer safety because Dep. Roberts did not know what kind of weapons were in the house and he was unfamiliar with the area.  (Vol. I, 56:15-25). Dep. Roberts told Defendant Jason Bergin that they could get him

---

[4]The sign posted on the door read: "Please do not knock on the door or call on your cell phone.  We have both been confined to complete and total isolation due to severe case of sleep deprivation.  Your cooperation with this matter is required and greatly appreciated however without any further considerations any and all violators will be shot on site.  Thank you and have yourself a pleasant day."

some socks or he could go to jail without them. (Vol. I, 56:9-10). Defendant Jason Bergin asked Dep. Canfield if he would get socks for him and he described where the socks were. (Vol. I, 56:11-12). Dep. Roberts then took Defendant Jason Bergin to his car. (Vol. I, 56:12-13). Dep. Canfield walked right by Defendant Powner who was standing just outside the threshold and into the residence, got the socks, and took them out to the car. (Vol. I, 56:13-14, 65:10-11). Dep. Roberts prepared his report and then transported Defendant Jason Bergin. (Vol. I, 61:6-12).

Prior to Dep. Roberts transporting Defendant Jason Bergin, Dep. Canfield came out to his patrol vehicle and told him about the items of contraband that he saw in plain view. (Vol. I, 62:12-14). Dep. Canfield requested Dep. Roberts' camera, and went back inside to take photos. (Vol. I, 84:8-10). Dep. Canfield was the only one he saw physically go into the residence although there were other officers who were at the scene. (Vol. I, 86:2-3).

**Dep. Christopher Canfield:  (Vol. I, pp. 93 -155):**

Christopher Canfield (Dep. Canfield) has worked for the LCSO since 2005 as a road patrol officer. (Vol. I, 94:1-7). He was involved in the arrest of Defendant Jason Bergin on July 28, 2009. (Vol. I, 94:11-13). He responded to assist Dep. Roberts in reference to a warrant for Defendant Jason Bergin. (Vol. I, 95:2-4). After arriving at the scene, he went around to the side of the house to maintain a visual of the back of the house as well as a visual on Dep. Roberts. (Vol. I, 95:8-13). When he walked up on the porch, Dep. Roberts was in the process of placing Defendant Jason Bergin in handcuffs. (Vol. I, 100:25, 101:1-4). Defendant Jason Bergin asked if he could get a pair of socks out of his bedroom. (Vol. I, 101:18-19). They informed him no. (Vol. I, 101: 19). Defendant Jason Bergin then asked if they could go in and get them for him. (Vol. I, 101:19-20). Defendant Jason Bergin explained to him that the socks were in the third drawer from the top of his

dresser. (Vol. I, 102:2-3). Dep. Canfield went inside and grabbed a pair of socks for him. (Vol. I, 102:3-4). Defendant Powner was present and followed him, stopped at the threshold of the door and watched what he was doing. (Vol. I, 102:5-24).

When Dep. Canfield went into the room to retrieve the socks, he noticed a water bong underneath an end table next to the bed. (Vol. I, 103:13-15). When he walked over towards the water bong to inspect it, he noticed a drawer on the end table was open about three and a half to four inches. (Vol. I, 106:1-3). He noticed a spoon with residue on it and some syringes and an empty pill bottle. (Vol. I, 106:3-5). The syringe had a clear fluid in it. (Vol. I, 106:18). As he was turning to exit, Dep. Canfield noticed some more syringes that were on a television monitor which was attached to the wall. (Vol. I, 110:17-19). He then left the residence and called his sergeant. (Vol. I, 113:6-9). He never went back inside the house after calling his sergeant. (Vol. I, 125:12-24). He recalls giving Defendant Jason Bergin his socks while he was still being handcuffed on the porch, before he went back to inspect the water bong. (Vol. I, 112:22-25, 113:1-5, 137:6-20, 139:10-14, 146:15-19). He does not recall ever asking Dep. Roberts for a camera or ever returning back into the house. (Vol. I, 124:3-7, 125:25, 126:1-5, 138:18-20).

While he was on the scene, which was for approximately four hours, Defendant Carey Bergin and Hamilton arrived. (Vol. I, 113:16-17, 114:6-8). He did not speak with either of them, but did speak with Defendant Powner. (Vol. I, 115:5-10). Defendant Powner was described as being "out of it", slurring his words, drooling out of his mouth, and barely coherent. (Vol. I, 115:18-25, 116:1). Prior to leaving the scene, he reported to Det. Rodrigo what he had seen in the house. (Vol. I, 116:19-22).

**Det. Pete Rodrigo:   (Vol. I, 156-207):**

Pete Rodrigo (Det. Rodrigo) has worked for the LCSO for approximately 12 years.  (Vol. I, 157:8-12).  He is currently assigned as an undercover narcotics detective and has been serving in that capacity for four years.  (Vol. I, 157:13-17).  He responded to the scene at approximately four in the morning  (4:00am.) after having been called out by the road sergeant, Sergeant Magas (Sgt. Magas).  (Vol. I, 158:8-15). Sgt. Magas told him that upon the arrest of Defendant Jason Bergin that there was drug paraphernalia was found inside a room, there were drugs inside the room and possibly more drugs inside the safe.  (Vol. I, 167:16-22).  Det. Rodrigo was also briefed by Dep. Canfield.  (Vol. I, 160:17-18).

Det. Rodrigo  made contact with Defendant Carey Bergin while on the scene.  (Vol. I, 160:6-8).  Defendant Jason Bergin was not on the scene when he arrived.  (Vol. I, 160:23-25, 161:1-2).  He does not recall who told him about a safe, but he believed it may have been Sgt. Magas. (Vol. I 161: 17-19).  He spoke with Defendant Carey Bergin about the safe and asked her to go inside the trailer.  (Vol. I, 161:13-14).  Defendant Carey Bergin told him there were pills inside the safe that did not belong to her nor Defendant Jason Bergin but that they belonged to Defendant Powner.  (Vol. I, 161:22-25, 162:1).  When he initially started speaking to Defendant Carey Bergin, she was outside and then they walked inside the trailer into her room.  (Vol. I, 162:2-5).

After Defendant Carey Bergin told him there were illegal pills inside the safe, he asked her if she knew the code.  (Vol. I, 162:8-10).  She said she didn't remember it but he asked her if they could go inside and try and write the numbers down on a piece of paper and then open the safe.  (Vol. I, 162:10-13).  He asked her if he could go inside the room with her and she said sure.  (Vol. I, 186:14-15).  She offered to open the safe for him and was successful in doing so after a couple of

minutes of trying.  (Vol. I, 162:14-17).  The safe was located in the closet next to the bathroom in Defendants Jason and Carey Bergin's bedroom.  (Vol. I, 162:19-22).  He was able to see the safe immediately upon entering the room because the closet door was open.  (Vol. I, 166:19-25).

Defendant Carey Bergin was never arrested on that evening.  (Vol. I, 163:1-2).  While he spoke with her, she did not appear to be under the influence of any drugs and was not slurring her speech; she was coherent, and was able to answer questions directly. (Vol. I, 163:3-16).

Once she got the safe opened, he observed a prescription bottle filled with Roxicodone pills, some prescription paper with actual scripts, credit cards under Defendant Jason Bergin's name, and some money.  (Vol. I, 164:22-25).  He immediately called Det. Nolen and told him that he suspected prescription fraud.  (Vol. I, 165:1-7).

At one point in time, he attempted to speak with Defendant Powner.  Defendant Powner appeared to be under the influence of alcohol, was really out of it, and was difficult to speak with. (Vol. I, 204:4-6).  He asked him two questions and then Defendant Powner went back to sleep.  (Vol. I, 164 6-8).

**Det. Jamie Keith Nolen:  (Vol. I, 207-270):**

Jamie Keith Nolen (Det. Nolen) has been with the LCSO for approximately seven years and is currently assigned to the Special Investigations Division Narcotics Unit, Pills Diversion Team where he has been working for approximately 13 months.  (Vol. I, 208:5-15).  He responded to the scene at approximately 6:00 a.m.  after receiving a telephone call from Det. Rodrigo for assistance by a pills detective.  (Vol. I, 208:24-25, 209:1-14, 215:6-7).  He dealt primarily with Det. Rodrigo when he got to the scene.  (Vol. I, 210:6-9).  Det. Nolen was advised by Det. Rodrigo that he was called out by the road deputies who had arrested someone on a warrant and had found drug

paraphernalia inside the house. (Vol. I, 210:10-13). Det. Rodrigo told him they had found Oxycodone pills and prescriptions and blank prescription forms, along with needles and ledgers. (Vol. I, 210:14-16). He did not speak with any of the other deputies at that time. (Vol. I, 212:9-14).

After he spoke with Det. Rodrigo, he spoke to Defendant Carey Bergin to find out if there was anyone else in the apartment. (Vol. I, 211:17-22). Defendant Carey Bergin gave him permission to search the residence. (Vol. I, 211:21-25, 215:8-13). He informed her that he was going to get a search warrant anyway - he wanted to make sure that it was done properly. (Vol. I, 212:1-9). He then entered the residence to clear it. (Vol. I, 215:13-17). He noticed paraphernalia and other items in plain view as he cleared the residence. (Vol. I, 215:17-19).

At approximately 1:00 p.m. he obtained the signature of the judge and then executed the search warrant at the residence. (Vol. I, 215:25, 216:1-5). He took step by step photographs as he approached the residence, entered the residence, and looked throughout the residence. (Vol. I, 216:9-12). During the search of the residence, he seized multiple pieces of paraphernalia, hypodermic needles, multiple pages of blank prescription paper, ledgers with names, dates, a laptop and a hard drive, thumb drive, 300 Oxycodone pills in the name of Robert Powner, a bag of Methadone, a driver's license in the name for Defendant Jason Bergin, and other items of paraphernalia. (Vol. I, 216:17-25, 217:1-4).

When he arrived back on the scene, he came into contact with Hamilton and placed her under arrest for an open booking sheet. (Vol. I, 219:11-25). He again came into contact with Defendant Powner who was lying on the floor unresponsive and was transported from the scene via ambulance. (Vol. I, 220:11-18). He spoke with Defendant Carey Bergin at approximately 3:00 p.m. (Vol. I, 223:24-25, 224:1-5). He read her Miranda rights to her and then interviewed her in the apartment

adjacent to the one she lived in with Defendant Jason Bergin. (Vol. I, 224:17-22). She appeared to be coherent and was not slurring her words. (Vol. I, 264:11-18). Defendant Carey Bergin told him that her husband was printing fraudulent prescriptions and having subjects pass them to pharmacies to obtain controlled substances. (Vol. I, 226:11-14).

A month or a month and a half prior to the search of the residence, he put out a pharmacy alert for Theresa Martinez (Martinez) and Hamilton. (Vol. I, 236:11-15). She admitted who was involved in the drug trafficking conspiracy including, Defendant Powner, Martinez, Hamilton, Defendant Jason Bergin, Albert , and maybe Julie Becker (Becker). (Vol. I, 262:7-15). After the search of the residence, he put out a pharmacy alert for Defendant Jason Bergin, Defendant Carey Bergin, and Defendant Powner. He also contacted Dr. Gerald Klein a couple of days after the search. (Vol. I, 239:20-25, 240:1-3, 243:23-25).

During the search warrant, Det. Nolen recovered ledgers listing types of drugs relating to prescriptions, the individuals who passed those prescriptions, amounts of money etc. They were found on the sofa. (Vol. I, 249:1-25). The search warrant was served prior to his discussions with Defendant Carey Bergin. (Vol. I, 253:14-25, 254:9). The items he used to question Defendant Carey Bergin were either found in the safe by Det. Rodrigo, or items that he got as a result of the search warrant. (Vol. I, 254:15-25, 255:1).

Two of the individuals involved in the conspiracy contacted him independent of everything else. Becker contacted him from the Collier County Jail and Jarett Sprafka (Sprafka) also contacted him after he was told by a doctor that he was on the pharmacy alert system. (Vol. I, 263:10-23). He also spoke to Hamilton after her arrest. (Vol. I, 263:24-25, 264:1-10).

**April Campbell:  (Vol. I, 270-306):**

April Campbell (Campbell) testified that on April 28, 2009, she resided in the rear of the residence  at 20494 Sherrill Lane in Fort Myers with her boyfriend Josh Abernathy (Abernathy). (Vol. I, 272:8-14).  Some time after midnight, there was a knock on the door.  They went outside after being asked to do so by the Sheriff's Department. (Vol. I, 271:17-25, 272:1-21).  In her direct examination, Campbell testified that when she got to the front of the residence she saw Robert and Jay outside with two officers.  (Vol. I, 272:22-25, 273:1-6).  However, during cross examination, she testified that when she got to the front of the residence, Defendant Jason Bergin was already in the police car, but she saw Defendant Powner on the porch with at least two officers.  (Vol. I, 281:1-13, 290:17-25).  She recalls the police going in and out of the house.  (Vol. I, 294:2-20).

**Joshua Abernathy:  (Vol. I, 307-317):**

On July 28, 2009,  Abernathy resided at 20494 Sherrill Lane in Fort Myers with his girlfriend Campbell.  (Vol. I, 307:19-25).  They heard a knock on the door and exited the residence through the back door and around to the front of the house.  (Vol. I,308:24-25, 309:1-8).  He observed Defendant Jason Bergin in the squad car and Defendant Powner go into the room with several "cops" behind him.  (Vol. I, 309:11-20).  He saw police officers going in and out of the residence.  (Vol. I, 316:6-9).

**Angelique Bond:  (Vol. I, 318-323):**

Angelique Bond testified that Defendant Carrie Bergin came to her house right around midnight and brought her groceries.  (Vol. I, 320:5-13).  One of the neighbors told them the police were at the Bergin residence.  (Vol. I, 321:7-10).  She went to the residence to find out what was

going on. (Vol. I, 321:13-18). Defendant Carrie Bergin was at her residence for about three hours before going home. (Vol. I, 322:9-12).

**Amber Baginski: (Vol. II, 322-476):**

Amber Baginski (Agt. Baginski) works on the task force for the Drug Enforcement Administration and has been in that position for the past three years. (Vol. II, 332:10-17). Agt. Baginski has been a law enforcement officer for approximately 12 years. (Vol. II, 332:20-21). She became involved in this investigation on August 3, 2009, after being contacted by the LCSO in reference to an arrest that had been made regarding Defendant Jason Bergin. (Vol. II, 334:16-21). Agt. Baginski testified that prior to the search warrant on July 28, 2009, there was independent evidence that was derived as a part of this conspiracy. (Vol. II, 339:5-8).

Hamilton was arrested by the LCSO on July 28, 2009. However, in June of 2009, she went into a pharmacy in Lee County and presented a fraudulent script for 120 Oxycodone pills to the pharmacist. This script was linked to Dr. Gerald Klein, East Coast Pain Management. (Vol. II, 338:9-20). The pharmacist was suspicious of the high amount of drugs, and therefore, contacted Dr. Klein's office and spoke with his office Manager, Mr. Obermeyer (Obermeyer). (Vol. II, 340:3-6). Obermeyer informed him that they had been inundated at his office with fraudulent scripts from Lee and Collier Counties. (Vol. II, 340:7-9). The pharmacist asked Obermeyer to compile a list of individuals who he believed had passed fraudulent scripts so that he could provide them to law enforcement. (Vol. II, 340:14-18). The list was compiled in June and sent to Det. Nolen as well as Agt. Baginski. (Vol. II, 340:20-24). Although a deputy was sent to interview Hamilton, she was released after the interview. However, Det. Nolen completed an investigation by interviewing the pharmacist and then did a taped statement with Obermeyer and Dr. Klein. (Vol. II, 343:25, 344:1-4).

It was for that incident that Hamilton was arrested on July 28, 2009. (Vol. II, 344:5-8). After Hamilton was arrested and transported, she requested to speak with Det. Nolen who informed her that she could contact him at the LCSO after bonding out. (Vol. II, 345:1-7). She contacted him and did an interview on August 28, 2009. (Vol. II, 345:7-25). Both Agt. Baginski and Det. Nolen interviewed Hamilton who informed them that she had been passing fraudulent prescriptions for Oxycodone, Methadone, and Alprazolam for Defendants Carey and Jason Bergin. (Vol. II, 346:9-13). She named several people who she was aware of that were also passing fraudulent prescriptions for the Bergins including Martinez, Defendant Powner, and Albert as well as others not indicted in this case. (Vol. II, 346:14-21).

Agt. Baginski also spoke with Becker who gave her evidence of the conspiracy. (Vol. II, 347:5-18). Becker had been arrested in Collier County on August 4, 2009, after passing a fraudulent prescription for Oxycodone. (Vol. II, 347:23-25). Post <u>Miranda</u>, she informed Collier County that she was passing prescriptions for Defendants Carey and Jason Bergin in Fort Myers in an ongoing drug trafficking organization where several people would pass fraudulent prescriptions in order to obtain controlled substances. (Vol. II, 348:5-10). Agt. Baginski was contacted and spoke with Becker on August 11 and 18, 2009 at the Collier County Jail. (Vol. II, 348:16-23). Post <u>Miranda,</u> Becker told Agt. Baginski she had met the Bergin Defendants through her boyfriend, Albert, and that Albert told her that he had been working for them passing fraudulent prescriptions in order to obtain about 50 percent of whatever the fraudulent prescription was for. (Vol. II, 349:20-25). Eventually, she was asked to pass those prescriptions as well at Lee and Collier County pharmacies in order to obtain Oxycodone, Alprazolam, and Methadone. (Vol. II, 350:1-6). She detailed the fact that cellular phones were used, that the number of the cell phone would be placed on the prescription

so that when the pharmacy called to verify it, Defendant Carey Bergin would answer and pretend to be the pharmacist or the doctor's office confirming those prescriptions. (Vol. II, 350:10-16). Becker had a pink date planner which detailed the pharmacies, the different people passing the scripts, the number and type of drug, dates etc. (Vol. II, 350:17-25, 351:1-21). Agt. Baginski followed up with those pharmacies and obtained the original script that was used to obtain the controlled substances. (Vol. II, 351:22-25, 352:1-7). She also obtained a physicians profile which allowed her to obtain the prescriptions for certain doctors who were inundated with fraudulent prescriptions like Dr. Gerald Klein. (Vol. II, 352:8-17).

Agt. Baginski  interviewed Sprafka on August 26, 2009. (Vol. II, 353:8-10). Sprafka had been told by a doctor that he was listed on a pharmacy alert. (Vol. II, 354:12-20). Post Miranda, Sprafka told her that when he found out he was on a pharmacy alert, he became really scared, went home and shredded all of his prescriptions, destroyed the hard drive on his computer and any other evidence he had. (Vol. II, 355:6-11). Sprafka detailed that he had met the Bergin Defendants through Albert and that he started passing fraudulent prescriptions for them for a percentage. (Vol. II, 357:9-16). He said that because he was working, he actually started financing some of the Bergins' fraudulent prescriptions so that he would get a larger percentage of the pills. (Vol. II, 357:16-23). At one point, he was passing prescriptions for the Bergin Defendants as well as producing his own fraudulent prescriptions. (Vol. II, 358:1-4). He mentioned Defendant Jason Bergin, Defendant Carey Bergin, Defendant Powner, Becker, Albert, Matt Gross (Gross), and David Popham (Popham) as being involved in the drug trafficking organization. (Vol. II, 359:4-12).

Agt. Baginski was also involved in the arrest of Defendant Carey Bergin after the federal indictment on September 22, 2009. (Vol. II, 364:13-18). Both she and Albert were arrested at the

Sherrill Lane address. (Vol. II, 364:22-25, 365:1-8). Post <u>Miranda</u>, Agt. Baginski asked Defendant Carey Bergin if there were any other fraudulent prescriptions in the house at which time she was taken into the main part of the residence and given a white envelope containing approximately six blank prescriptions in the name of Dr. Gerald Klein from East Coast Pain Management. (Vol. II, 366:17-25, 367:1-4). There were also ledgers and notes with names of individuals that were written down on pieces of paper, notebooks, and three cell phones that were seized at that time. (Vol. II, 367:15-20).

Post <u>Miranda</u>, Defendant Carey Bergin told her that she and her husband, Defendant Jason Bergin, had started making fraudulent prescriptions in approximately 2007 but after being arrested a couple of times, they decided to hire other people to do it with them and create their own fraudulent prescriptions. She detailed how they came up with scripts for answering the phones when the pharmacies called and told her who was passing the prescriptions for them. (Vol. II, 376:21-25, 377:1-5). She indicated that the individuals would get approximately 15 percent of the pills they had passed after the pills were brought back to her and Defendant Jason Bergin, and they would retain the rest. (Vol. II, 377:6-10). She indicated that they then used some for personal use and sold the rest out of the house or would drive places to sell them to people. (Vol. II, 377:10-13). Defendant Carey Bergin outlined others involved in the conspiracy with her and Defendant Jason Bergin as Hamilton, Defendant Powner, Martinez, Albert, Sprafka, Gross, Becker, and Popham. (Vol. II, 378:11-15).

After his arrest, she also interviewed Albert. (Vol. II, 375:19-21). In the post <u>Miranda</u> interview, Albert told her that he had been working for the Bergin Defendants in their drug trafficking organization and had been friends with the Bergins for a long period of time. (Vol. II,

376:4-7).  He outlined that his girlfriend, Becker, was also passing scripts for them and he detailed specific names of other individuals that were also working for the Bergins including Defendant Powner, Theresa Martinez, Hamilton, Becker, Sprafka,  Gross, and Matthew Davis (Davis).  (Vol. II, 376:4-11, 385:21-23).

Agt. Baginski was also involved in the arrest of Defendant Powner on September 23, 2009.  (Vol. II, 382:2-4).  He did not appear to be under the influence of any drugs or alcohol and elected to waive his rights.  (Vol. II, 383:4-14).  Defendant Powner outlined that he had know the Bergin Defendants and had been passing fraudulent prescriptions for them since roughly 2007.  (Vol. II, 383:17-19).  He did not initially know they were creating the fraudulent prescriptions but thought Defendant Jason Bergin had gotten a doctor that was giving him prescriptions illegally. (Vol. II, 383:19-21).  He did, however, know that he had not gone to a doctor and obtained the prescriptions for himself.  (Vol. II, 383:22-24).  He eventually found out they were creating the prescriptions at home.  (Vol. II, 383:24-25).  Defendant Powner outlined the people involved in the conspiracy as the Bergin Defendants, himself, Martinez, Hamilton, Sprafka, Albert, and Popham.  (Vol. II, 384:23-25).

At the same time as Defendant Powner was arrested on September, 23, 2009, Agt. Baginski arrested Martinez .  (Vol. II, 385:24-25, 386:1-4).  Post Miranda, Martinez told her that she was the girlfriend of Defendant Powner and that she had been passing fraudulent prescriptions for the Bergin Defendants in their drug trafficking organization for Oxycodone, Methadone, and Alprazolam.  (Vol. II, 386:21-25).  She indicated the individuals involved were the Bergin Defendants, herself, Powner, Hamilton, Albert,  Popham, and Sprafka. (Vol. II, 287:14-20).

**Robert Powner (Vol. II, 479- 501):**

On July 28, 2009, Powner testified that he was living at 20494 Sherrill Lane as he was doing repairs at the residence. (Vol. II, 479:20-21, 480:11-14). There was a knock at the door which he answered and discovered it was the LCSO who had a warrant for Defendant Jason Bergin for violation of probation. (Vol. II, 482:3-11). He closed the door and told the officer "just a minute." (Vol. II, 482:11). He told Defendant Jason Bergin that LCSO was there with a warrant for violation of probation and that he needed to go outside. (Vol. II, 482:12-15). For approximately 90 seconds to 2 minutes, he and Jason "cleaned up the room." (Vol. II, 482:16-25). Defendant Powner testified there was no evidence of drug paraphernalia visible to the naked eye in the room, that the dresser drawer and closet were closed. (Vol. II, 483:1-16). Defendant Powner opened the door for Defendant Jason Bergin to exit and then stood in the doorway with his hand on the doorknob watching the officers handcuff Defendant Jason Bergin. (Vol. II, 483:17-23). Defendant Powner recalls Defendant Jason Bergin looking at him and asking him, "Bobby, will you get me some shoes and socks." (Vol. II, 486:12-13). At that point, he closed the door, turned to the dresser, pulled the dresser drawer open and got Defendant Jason Bergin a pair of socks. He then opened the door, handed the socks to Dep. Canfield and asked Defendant Jason Bergin where his shoes were. (Vol. II, 487:15-25, 488:1-4). He told him they were in the closet so he again closed the door, turned around and started towards the closet. (Vol. II, 488:4-8). Defendant Powner turned around and noticed Dep. Canfield had come into the room behind him so he instructed him to leave, that he was not allowed in the room and that he needed to "get . . . out." (Vol. II, 489:2-5). Dep. Canfield looked down and noticed a water bong and told Defendant Powner that he had to leave the room.

(Vol. II, 489:12-21).  Defendant Powner testified to numerous felony arrests and convictions as well as several aliases.  (Vol. II, 499:6-25, 500:1-25).

**Manuel Vasile (Vol. II, 502 - 512):**

Manual Vasile (Inv. Vasile) is employed as an investigator with the Federal Public Defender's Office in the Fort Myers Division.  (Vol. II, 502:16-19).  He was able to obtain records in regard to a food stamp card in the name of the Bergin Defendants which was used to purchase $524.09 in merchandise at Walmart  on July 28, 2009 at 12:30 a.m.  (Vol. II, 503:3-19).

## DISCUSSION

The Defendants contend that their Fourth Amendment rights were violated when Dep. Canfield entered the residence without a warrant and observed incriminating drug paraphernalia in plain sight.  The Defendants maintain that the initial search was illegal and therefore, the evidence seized as a result of the subsequent search by Det. Rodrigo and the search warrant obtained by Det. Nolan should be suppressed along with any and all statements that may have been made as a result of the Defendants' arrest.

The Government responds that no illegal entry occurred in violation of the Fourth Amendment.  In the alternative, the Government argues the independent source doctrine applies and, therefore, the evidence should not be suppressed.

### (1) *Standing Issue Robert Powner*

Based upon the Motion filed by Defendant Powner, the Court must first analyze whether or not he has standing to join in the Motion to Suppress.  The Fourth Amendment protects persons against unreasonable searches of "their persons [and] houses," and thus indicates that it is a personal right that must be invoked by an individual. But the extent to which the Amendment protects people

may depend upon where those people are. While an overnight guest may have a legitimate expectation of privacy in someone else's home <u>Minnesota v Olson</u>, 495 U.S. 91, 98-99, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1998), one who is merely present with the consent of the householder may not. <u>Edwards v. Secretary Department of Corrections</u>, 2008 WL 786331 * 6 (M.D. Fla. March 21, 2008) (citing <u>Minnesota v. Carter</u>, 525 U.S. 83, 90, 119 S. Ct. 469, 142 L. Ed. 2d (1998).

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.**" **<u>Alderman v U.S.</u>, 394 U.S. 165, 174, 89 S. Ct. 961, 22 L. Ed. 2d 176 (1969) With respect to a third party's premises, a person's standing to challenge a search will depend on whether the person has a reasonable expectation of privacy in the premises, and whether it is an expectation of privacy that society is prepared to recognize. <u>Olson</u>, 495 U.S. at 97-98.

An overnight guest has a recognized expectation of privacy in a third party's premises. <u>Id</u>. At 96-97. This expectation of privacy is sufficient to confer standing to challenge a search of the premises. <u>Id.</u> "From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host will allow inside." <u>Id.</u> at 99. These expectations are shared and valued by society, and therefore recognized under the Fourth Amendment. <u>Id.</u> at 98.

In contrast, a person located at a third person's premises solely for a business transaction does not have a reasonable expectation of privacy in the premises and has no standing to challenge a search. <u>Carter</u>, 525 U.S. at 91. Factors such as the "commercial nature of the transaction, the relatively short period of time on the premises, and the lack of any previous connection between the [person] and the householder" all lead to a diminished connection to the premises and consequently, a diminished expectation of privacy. <u>Id.</u> at 91.

The Government argues from <u>Minnesota v Carter</u>, that Defendant Powner was engaged in a commercial business transactions, namely drug dealing, while he was in the residence. In <u>Carter</u>, the defendant was sitting at a table bagging cocaine when the police observed them through the window. A search was conducted after a search warrant was issued. The defendant challenged the search warrant, but Carter's Motion was denied because he was engaged in a commercial transaction, bagging cocaine, at the time. The Court in <u>Carter</u>, held the purely commercial nature of the defendant's involvement in the transaction, the relatively short period of time that the defendant was present on the premises, and the lack of any previous connection between the defendant and the householder all led to the conclusion that their situation is closer to that of one simply permitted on the premises. <u>Id.</u> at 91. Thus, the <u>Carter</u> Court found that any search which may have occurred did not violate their Fourth Amendment rights, because respondents had no legitimate expectation of privacy. <u>Id.</u>

In contrast to <u>Carter</u>, Defendant Powner testified he was staying in the house, had some of his personal belongings in the house, and was not seen actively participating in a commercial operation by the police when they arrived on the scene.(Vol. I, 9:10-19,11:3-6, 14:18-24). Campbell and Abernathy also testified as to Defendant Powner's length of stay at the residence stating that he stayed at the residence from time to time and that he was staying there on the night of July 28, 2009. Defendant Powner's testimony, and that of Campbell and Abernathy, is sufficient to establish Defendant Powner had a reasonable expectation of privacy in the residence and, therefore, it is recommended Defendant Powner has standing to challenge the search pursuant to the holding in <u>Minnesota v. Olsen</u>.

## (2) *Credibility Analysis*

The testimony of Defendant Powner conflicts with the testimony of Dep. Canfield, thus, the Court will perform a credibility analysis. When weighing the credibility of witnesses, the Court does not look at the status of the witness, but rather the Court must weigh the testimonies of all the witnesses, the consistencies or inconsistencies in their testimonies, their demeanor on the stand, and the witnesses' interest in the outcome of the hearing. U.S. v. Ramirez-Chilel, 289 F.3d 744, 749-750 (11th Cir. 2002).

Defendant Powner testified he told Dep. Canfield that he could not enter the residence. Defendant Powner recalls Defendant Jason Bergin looking at him and asking him, "Bobby, will you get me some shoes and socks." (Vol. II, 486:12-13). At that point, Defendant Powner testified he closed the door, turned to the dresser, pulled the dresser drawer open, and got Defendant Jason Bergin a pair of socks. He then opened the door, handed the socks to Dep. Canfield and asked Defendant Jason Bergin where his shoes were. (Vol. II, 487:15-25, 488:1-4). Defendant Jason Bergin told him they were in the closet so he again closed the door, turned around, and started towards the closet. (Vol. II, 488:4-8). Defendant Powner noticed Dep. Canfield had come into the room behind him so he instructed him to leave, that he was not allowed in the room and that he needed to "get . . . out." (Vol. II, 489:2-5). Dep. Canfield looked down and noticed a water bong and told Defendant Powner to leave the room. (Vol. II, 489:12-21).

Dep. Canfield testified that when he walked up on the porch, Dep. Roberts was in the process of placing Defendant Jason Bergin in handcuffs. (Vol. I, 100:25, 101:1-4). He testified that Defendant Jason Bergin asked if he could get a pair of socks out of his bedroom. (Vol. I, 101:18-19). The officers informed him that he could not. (Vol. I, 101: 19). Defendant Jason Bergin then

-21-

asked if they could go in and get them for him. (Vol. I, 101:19-20). Bergin explained to him that the socks were in the third drawer from the top of his dresser. (Vol. I, 102:2-3). Dep. Canfield went inside and grabbed a pair of socks for him. (Vol. I, 102:3-4).

After hearing the testimony of Dep. Canfield and Defendant Powner, the Court finds Dep. Canfield's testimony to be more credible. While on the stand, Dep. Canfield's demeanor was forthright and calm. Defendant Powner was argumentative and belligerent. Defendant Powner has a vested interest in the outcome of the hearing, specifically his own liberty. Furthermore, it is simply not credible that trained officers making a felony arrest would allow an individual to continue to enter a residence and close the door. The officers' own safety interest and training would prevent a reasonable officer from allowing the Defendant to enter the residence, shut the door, emerge with socks, reenter the residence, and again close the door to look for shoes.

Defendant Powner's condition on that night, as testified to by the officers, clouded his ability to recall details. Therefore, his ability to recall is questionable. Dep. Canfield described Defendant Powner as being "out of it", slurring his words, drooling out of his mouth, and as barely coherent. (Vol. I, 115:18-25, 116:1). Defendant Powner's impairment was severe enough that an ambulance was called because he kept passing out. (Gov.t's Ex. 21). Defendant Powner admitted to EMTs that he had been using Oxycodone for recreational use that evening. (Gov't. Ex. 21). As a result, the Court finds Defendant Powner's testimony not credible.

In addition to calling Campbell and Abernathy regarding the issue of standing, Defendant Powner called them to refute the officers' claims. Campbell and Abernathy presented testimony that conflicted in part with Dep. Canfield's testimony.

Campbell testified she observed numerous officers going in and out of the residence after Defendant Powner told her he went in to get Defendant Jason Bergin his shoes and socks. (Vol. I, 294:1-20). However, she also testified that she did not know what transpired between the officers, Defendant Jason Bergin, and Defendant Powner and that she did not know who actually retrieved the socks and shoes for Defendant Jason Bergin. (Vol. I 292:5-6). Joshua Abernathy also testified that he observed police officers going in and out of the residence. (Vol. I, 316:6-9).

Regarding the number of officers going back and forth into the residence, in addition to Deputy Canfield, it is documented that Det. Rodrigo and Det. Nolan entered the residence at some point during the early morning hours. Det. Rodrigo testified that he entered the residence with Defendant Carey Bergin's consent and with her accompanying him to search the residence and the safe in the closet. (Vol. I, 161:10-16).

Det. Nolan also entered the residence while he was present at the scene with Defendant Carey Bergin sometime after six (6:00am.) that morning. Det. Nolan testified that after he spoke with Det. Rodrigo, he spoke to Defendant Carey Bergin to find out if there was anyone else in the apartment. (Vol. I, 211:17-22). Defendant Carey Bergin gave him permission to search the residence. (Vol. I, 211:21-25, 215:8-13). He then entered the residence to clear it. (Vol. I, 215:13-17). Thus, it is possible that Campbell and Abernathy saw officers enter the residence, but those officers had Defendant Carey Bergin's consent to enter. Thus, the testimonies of Campbell and Abernathy did not contradict nor challenge the credibility of Dep. Canfield's testimony.

Campbell also testified that Defendant Powner was not having any problems speaking or standing up. (Vol. I, 294:21-25, 295:1-25). However, the officers on the scene had to call an ambulance because Powner kept passing out and was slurring his words. (Gov't. Ex. 21). In fact,

the EMT's found that Powner was unresponsive and kept falling asleep while they spoke with him, and that he admitted to taking Oxycodone for recreational use that evening. (Gov't. Ex 21). Consequently, the Court finds that the testimony of Campbell was simply not credible.

*(3) Whether the Independent Source Doctrine Applies*

The Defendants maintain that the initial search was illegal and therefore, the evidence seized as a result of the subsequent search by Det. Rodrigo and the search warrant obtained by Det. Nolan should be suppressed along with any and all statements that may have been made as a result of the Defendants' arrest. The Government argues that all the information gathered in the early morning hours of July 28, 2009, would have been derived from an independent secondary source, and therefore, the Motion to Suppress should be denied.

The exclusionary rule requires suppression of all evidence seized during an unlawful search, up to the point at which the connection with the unlawful search becomes so "attenuated as to dissipate the taint."U.S. v Flores, 2008 WL 4593560 * 3 -5 (S.D.Fla. October 14, 2008) (citing Murray v. U.S., 487 U.S. 533, 536-37, 108 S. Ct. 2529, 101 L. Ed.2d 472 (1988) (internal citations omitted). It is well-established, however, that the exclusionary rule is not applied every time a constitutional violation occurs. Flores, 2008 WL 4593560 * 3 -5 (citing Hudson v. Michigan, 547 U.S. 586, 126 S.Ct. 2159, 165 L. Ed.2d 56 (2006) (violation of "knock-and-announce" rule did not require suppression of all evidence found in search); U.S. v. Herring, 492 F.3d 1212 (11th Cir.2007) (application of the exclusionary rule rejected where there had been an unlawful search conducted incident to an unlawful arrest based on an administrative error). "Suppression of evidence, however, has always been our last resort, not our first impulse." Hudson, 126 S. Ct. at 2163. Because the exclusionary rule generates "substantial societal costs," the Supreme Court has been cautious about

expanding the rule and has held it applicable only "where its remedial objectives are thought most efficaciously served." Id.; Herring, 492 F.3d at 1216 ("the test for extending the exclusionary rule is whether the costs of doing so are outweighed by the deterrent benefits.").

The exclusionary rule is inapplicable, for instance, where the government has discovered or obtained incriminating evidence from an "independent source." Segura v. U.S., 468 U.S. 796, 805, 814, 104 S. Ct. 3380, 82 L. Ed.2d 599 (1984) (suppression of the fruits of a legal search was not warranted despite illegal entry into defendants' apartment; "[n]one of the information on which the [search] warrant was secured derived from or related in any way to the initial [illegal] entry into [defendant's] apartment"); New York v. Harris, 495 U.S. 14, 20, 110 S. Ct. 1640, 109 L. Ed.2d 13 (1990) (notwithstanding that police violated the defendant's Fourth Amendment rights by arresting him at home without a warrant, the incriminating statement he later gave at the police station was not suppressed because it was the product of his being under arrest and in custody, not the product of the fact that he was arrested in his house rather than someplace else). As the Supreme Court reaffirmed in Segura:

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course, this does not mean that the facts thus obtained become sacred and inaccessible. *If knowledge of them is gained from an Independent source they may be proved like any others.*

468 U.S. at 814 (internal citation omitted; emphasis in original).

In other words, evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality are not subject to exclusion. Murray, 487 U.S. at 537. The independent source doctrine rests upon the policy that:

while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied. So long as a later, lawful seizure is genuinely independent of an earlier, tainted one (which may well be difficult to establish where the seized goods are kept in the police's possession) there is no reason why the independent source doctrine should not apply.

Id. at 542; see Nix v. Williams, 467 U.S. 431, 443, 104 S. Ct. 2501, 81 L .Ed.2d 377 (1984) ("[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred.... When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.").

The Government argues that information discovered during an ongoing operation by Task Force Agt. Baginski, and evidence provided by co-defendants independent of the July 28, 2009, search would have led to the inevitable search of the Bergin Defendants' residence, and the discovery of the evidence uncovered on July 28, 2009. The Government argues that information about Defendants Jason and Carey Bergin's conspiracy was discovered as early as June of 2009, when Hamilton was first interviewed. (Vol. II, 335:4-15, 339:5-20).

Defendant Carey Bergin argues that the information provided by Hamilton in June did not implicate the Bergin Defendants nor their residence. Instead, all of the information leading to the subsequent arrest of Defendant Jason Bergin, Defendant Carey Bergin, Albert, Hamilton, Defendant Powner, and Becker was derived from the search at the Bergin Defendants' residence on July 28, 2009. Thus, the taint extends to all of the individuals because the ledgers and evidence obtained from an illegal search led to the subsequent arrests.

In June 2009, Hamilton presented a fraudulent script for 120 Oxycodone pills to the pharmacist. This script was linked to Dr. Gerald Klein, East Coast Pain Management. (Vol. II, 338:9-20). The Defendants used Dr. Klein's name on their false prescriptions. The pharmacist was suspicious of the amount of drugs, and therefore, contacted Dr. Klein's office and spoke with his office manager, Obermeyer. (Vol. II, 340:3-6). Obermeyer informed him that they had been inundated at his office with fraudulent scripts from Lee and Collier Counties. (Vol. II, 340:7-9). The pharmacist asked Obermeyer to compile a list of individuals who he believed had passed fraudulent scripts so that he could provide them to law enforcement. (Vol. II, 340:14-18). The list was compiled in June and sent to Det. Nolen as well as Agt. Baginski. (Vol. II, 340:20-24). However, Hamilton did not implicate the Bergin Defendants' in connection with her passing the false prescription in June of 2009. (Vol. II, 437:15-25, 438:1-4).

It was not until after Hamilton was arrested on July 28, 2009, and after she got out of jail, that she requested to speak to law enforcement. (Vol. II, 344:5-8). Hamilton was interviewed on August 28, 2009, by Agt. Baginski and Det. Nolan. (Vol. II, 346:1-4). During that meeting, Hamilton informed Agt. Baginski that she had been passing fraudulent prescriptions for Oxycodone, Methadone, and Alprazolam for Defendants Jason and Carey Bergin. (Vol. II, 346: 9-13).

During cross examination, Agt. Baginski testified there was not an open investigation of the Bergin Defendants prior to the July 28, 2009, search of the residence. While the investigation involving Hamilton in June of 2009, alerted officers that someone in the area was using Dr. Kline's name to pass false prescriptions, the individual or individuals behind the false prescriptions were not known at that time. Agt. Baginski testified the Bergin Defendants' organization was spelled out

after the ledgers were seized on July 28, 2009. (Vol. II, 446:20-24).  Thus, it does not appear that Hamilton's testimony was an independent source unrelated to the July 28, 2009, search.

Further, it appears that the other Defendants used by the Government as examples of independent sources were discovered and subsequently arrested after the search warrant was issued and the ledgers with the names of the conspirators were discovered. [5] As such, the Government's independent source argument lacks merit.

### (4) Warrantless Entry by Dep. Canfield

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." U.S. v Flores, 2008 WL 4593560 * 3 (S.D.Fla. October 14, 2008) (citing Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed.2d 639 (1980)).  "Except in special situations, we have consistently held that the entry into a home to conduct

---

[5]On August 4, 2009, Julie Becker was arrested for passing fraudulent prescription transactions.  Becker had in her possession a pink date planner which detailed the pharmacies, the different people passing the scripts, the number and type of drug, dates etc.  (Vol. II, 350:17-25, 351:1-21).  Agt. Baginski followed up with those pharmacies and obtained the original script that was used to obtain the controlled substances.  (Vol. II, 351:22-25, 352:1-7).

Agt. Baginski was also involved in the arrest of Defendant Carey Bergin after the federal indictment on September 22, 2009.  (Vol. II, 364:13-18).  Both she and Albert were arrested at the Sherrill Lane address.  (Vol. II, 364:22-25, 365:1-8).  Post Miranda, Agt. Baginski asked Defendant Carey Bergin if there were any other fraudulent prescriptions in the house at which time she was taken into the main part of the residence and given a white envelope containing approximately six blank prescriptions in the name of Dr. Gerald Klein from East Coast Pain Management.  (Vol. II, 366:17-25, 367:1-4).  There were also ledgers and notes with names of individuals that were written down on pieces of paper, notebooks, and three cell phones  that were seized at that time.  (Vol. II, 367:15-20).  Defendant Carey Bergin outlined others involved in the conspiracy with her and Defendant Jason Bergin as Hamilton, Defendant Powner, Martinez, Albert, Sprafka, Gross, Becker, and Popham.  (Vol. II, 378:11-15).

Defendant Powner was arrested on September 23, 2009. (Vol. II, 382: 2-4).  Defendant Powner said that he was involved with passing false prescriptions for the Bergins since 2007. (Vol. II, 383:17-25, 384:1-2).  Defendant Powner identified Defendants Jason and Carey Bergin, himself, Martinez, Hamilton, Sprafka, Albert, Popham, and others who were not indicted. (Vol. II, 384: 21-25).

a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant." <u>Flores</u>, 2008 WL 4593560 at * 3 (citing <u>Steagald v. U.S.</u>, 451 U.S. 204, 211, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981)). That is because the "Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." <u>Flores</u>, 2008 WL 4593560 at * 3 (citing <u>Payton</u>, 445 U.S. at 590).

Defendant Jason Bergin argues Dep. Canfield entered the Defendants' residence without consent and without a warrant. The Government contends that Dep. Canfield had the Defendant Jason Bergin's consent to enter the residence to retrieve his shoes and socks.[6]

Dep. Canfield testified that when he walked up on the porch, Dep. Roberts was in the process of placing Defendant Jason Bergin in handcuffs. (Vol. I, 100:25, 101:1-4). Defendant Jason Bergin asked if he could get a pair of socks out of his bedroom. (Vol. I, 101:18-19). They informed him no. (Vol. I, 101: 19). Defendant Jason Bergin then asked if they could go in and get them for him. (Vol. I, 101:19-20). Bergin explained to Dep. Canfield that the socks were in the third drawer from the top of his dresser. (Vol. I, 102:2-3). Dep. Canfield went inside and grabbed a pair of socks for him. (Vol. I, 102:3-4).

Once inside the residence Dep. Canfield noticed a bong sitting on the floor. (Vol. I, 103:13-15). When he walked over towards the water bong to inspect it, he noticed a drawer on the end table

---

[6]Defendant Powner's Counsel also raises the issue in his reply brief (Doc. # 194) that the entry onto the screen porch was a violation of the Fourth Amendment since no one consented for the officers to enter the porch area. Here the officers entered the porch area to knock on the Bergins' door to serve the warrant for Jason Bergin's arrest. Fourth Amendment protections are not implicated when an officer enters private land "to knock on a citizen's door" for legitimate police purposes unconnected with a search of the premises. <u>U.S. v Taylor</u>, 458 F,3d 1201, 1204 (11th Cir. 2006). Therefore, his objection is overruled.

was open about three and a half to four inches. (Vol. I, 106:1-3). He noticed a spoon with residue on it and some syringes and an empty pill bottle. (Vol. I, 106:3-5). The syringe had a clear fluid in it. (Vol. I, 106:18). As he was turning to exit, Dep. Canfield noticed some more syringes that were on a television monitor which was attached to the wall. (Vol. I, 110:17-19). Dep. Canfield left the residence and called his sergeant and reported what he saw. Dep. Canfield admits that afterwards that he re-entered the residence to further inspect what he observed. (Vol. I, 112:22-25, 113:1-5, 137:6-20, 139:10-14, 146:15-19).

Thus, the Court must examine each of Dep. Canfield's warrantless entries into the residence. The initial entry into the residence was done at the request of Defendant Jason Bergin asking Dep. Canfield for socks. Though that verison of the events was disputed by Defendant Powner, the Court has determined that Dep. Canfield's testimony was the more credible. In this instance, Defendant Jason Bergin specifically looked at Dep. Canfield and asked him to retrieve a pair of socks from inside his residence. (Vol. I, 101:19-20). Once inside, he noticed the drug paraphernalia in plain sight. The warrant requirement may be excused by the voluntary consent of an individual possessing authority to allow the search. Georgia v Randolph, 547 U.S. 103, 109, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006). Dep. Canfield had the permission of Defendant Jason Bergin to enter the residence, therefore, the entry into the residence did not violate the Fourth Amendment.

The issue then becomes whether or not the drug paraphernalia seen by Dep. Canfield and used by Det. Nolan to obtain a search warrant should be suppressed because Dep. Canfield reentered the residence a second time without a search warrant. It appears Dep. Canfield's second entry into the residence was a violation of the Fourth Amendment. However, Dep. Canfield did not see additional contraband during the second entry nor did he seize or destroy any of the contraband noted

during the first consensual entry into the residence.  Thus, the challenged evidence is admissible because it was obtained from the lawful initial entry, and not from the second warrantless entry.

### *(5) Whether Defendant Carey Bergin's Consent to Search was Tainted or Voluntary*

Defendant Carey Bergin states that if the Court should find that Dep. Canfield's initial entry was valid, only then would Carey Bergin's consent become an issue. The Government argues that even if the consent was not valid because it was tainted, the information would have eventually come from other ongoing investigations that included the Bergin Defendants, and thus, her statements should not be suppressed.

A consent to search may be insufficient where the consent itself springs from prior illegal activity by the police, such as an unlawful entry. U.S. v. Quintana, 594 F. Supp. 2d 1291, 1303 (M.D. Fla. 2009) (citing U.S. v. Delancy, 502 F.3d 1297, 1308 (11th Cir.2007)). In such cases, "[t]he proper inquiry is not simply whether [a defendant's] will was overborne by [law enforcement's] illegal entry, but also whether [the defendant's] consent was a 'product' of that illegality." Quintana, 594 F. Supp. 2d at 1303 (citing U.S. v. Santa, 236 F.3d 662, 677 (11th Cir.2000) (finding consent invalid where given three minutes after DEA agents unlawfully kicked in the defendant's door, entered his apartment, ordered him to the floor, and handcuffed him); *see* U.S. v. Myers, 290 Fed. Appx. 305, 307-08 (11th Cir.2008) (per curiam) (unpublished) (remanding where district court found consent was voluntary but failed to determine whether it was tainted by prior illegal search). Det. Rodrigo testified that he made contact with Defendant Carey Bergin while she was still on the scene. (Vol. I, 160:6-8). Det. Rodrigo asked Defendant Carey Bergin about items seen inside the residence including a safe observed in the Defendant's bedroom closet.  He does not recall who told him about

a safe, but he believed it may have been Sgt. Magas.[7] (Vol. I 161: 17-19). However, he did testify that he was able to see the safe immediately upon entering the room because the closet door was open. (Vol. I, 166:19-25).

Det. Rodrigo spoke with Defendant Carey Bergin about the safe and asked her to go inside the trailer. (Vol. I, 161:13-14). Defendant Carey Bergin told him there were pills inside the safe that did not belong to her nor to the Defendant Jason Bergin but belonged to Defendant Powner. (Vol. I, 161:22-25, 162:1). After Defendant Carey Bergin told him there were illegal pills inside the safe, he asked her if she knew the code. (Vol. I, 162:8-10). She said she didn't remember it but he asked her if they could go inside and try and write the numbers down on a piece of paper and then open the safe. (Vol. I, 162:10-13). He asked her if he could go inside the room with her and she said sure. (Vol. I, 186:14-15). She offered to open the safe for him and was successful in doing so after a couple of minutes of trying. (Vol. I, 162:14-17).

Defendant Carey Bergin argues that her consent to search was invalid because it was tainted by knowledge that officers had illegally entered the residence and discovered drug paraphernalia. Therefore, she contends her consent was tainted by the officers' illegal act. Here, the Court has determined that Dep. Canfield's initial entry was legal. Dep. Canfield's first entrance into the residence was not a violation of the Fourth Amendment because it was made at the request and with the consent of Defendant Jason Bergin. As noted above, the items seen by Dep. Canfield should not be disregarded simply because he reentered the residence and observed the exact same evidence

---

[7]Sgt. Magas debriefed Det. Rodrigo on the events that took place at the residence prior to his arrival. (Vol. I, 167:10-22). Sgt. Magas advised Det. Rodrigo that Deps. Canfield and Roberts arrived at the residence to arrest Jason Bergin on a warrant and found drug paraphernalia with drugs inside the room and possibly more drugs inside a safe. (Vol. I, 167:19-22).

he observed during his initial entry. Thus, Defendant Carey Bergin's consent was not negated by an unlawful act by Dep. Canfield.

### (b) Whether Defendant Carey Bergin's Consent was Voluntary

At this point, the Court must determine whether or not Defendant Carey Bergin's consent was given voluntarily. It is well settled that under the Fourth Amendment, a search conducted without a warrant issued upon probable cause is " '*per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions.' " U.S. v Rivero, 2008 WL 4833093 * 6 (M.D. Fla. November 5, 2008)(citing Schneckloth v. Bustamonte, 12 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed 2d 854 (1973)(citations omitted) One established exception to the requirements of both a warrant and probable cause is that the search is conducted pursuant to consent. Id. (citations omitted); U.S. v Brown, 243 Fed. Appx. 544, 549 (11th Cir. 2007). A consent to search " 'must be the product of an essentially free and unconstrained choice.'"Rivero, 2008 WL 4833093 * 6 (citing U.S. v Zapata, 180 F. 3d 1237, 1241 (11th Cir. 1999) (quoting U.S. v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989)).

The Court must consider the totality of the circumstances to determine if the consent was voluntary. U.S. v. Drayton, 536 U.S. 194, 207, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002), " Schneckloth, 12 U.S. at 226. In considering the totality of the circumstances, the Court must examine several factors including any coercive police procedures, the defendant's cooperation with officers, the defendant's knowledge of her right to refuse to consent, the defendant's education and intelligence, and the defendant's belief that there is no incriminating evidence to be found. Brown, 2007 WL 2688662 at * 5. The burden is on the Government to show that the consent was freely and

voluntarily given. <u>Rivero</u>, 2008 WL 4833093 *6 (citing <u>U.S. v Tovar-Rico</u>, 61 F.3d 1529, 1536 (11th Cir. 1995).

Det. Rodrigo spoke with Defendant Carey Bergin and asked her if she would go inside the residence. Defendant Carey Bergin told Det. Rodrigo that there was a safe inside that contained narcotics but denied that they were hers or Defendant Jason Bergin's. Instead she said they belonged to Defendant Powner. She then took Det. Rodrigo inside and opened the safe for him.

The circumstances surrounding Carey Bergin's consent to search indicates that her consent to search was voluntarily made. Carey Bergin was not intoxicated; no force or coercion was used to entice her to consent to Det. Rodrigo entering the residence. From Det. Rodrigo's first contact with her, she was cooperative and willing to discuss the items in the residence including the safe and the narcotics contained inside the safe. Thus, it is respectfully recommended that Defendant Carey Bergin's consent to search the residence including the safe was voluntarily made.

<u>(6) Whether the Search Warrant Should be Suppressed</u>

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." <u>U.S. v Martin</u>, 297 F.3d 1308, 1312 (11th Cir. 2002). In issuing a valid search warrant under the Fourth Amendment a judge is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit there is a fair probability that contraband or evidence of a crime will be found in a particular place. <u>U.S. v. Robinson</u>, 62 F.3d 1325, 1331 (11th Cir. 1995) (citing <u>Illinois v. Gates</u>, U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). However, a judge's decision to issue a warrant may not be based on *per se* rules regarding probable cause or on knowledge gained during prior illegal searches. <u>Murray v. U.S.</u>, 487 U.S. 533, 542, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988). This

judicial exclusionary rule, was designed to safeguard Fourth Amendment rights and deter officials from overstepping their investigations without probable cause. U.S. v. Calandra, 414 U.S. 338, 348, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974).

The Defendants argue that the search warrant should be suppressed as the fruit of the poisonous tree because it was issued based upon information gathered from Dep. Canfield's illegal entry into the Bergins' residence. The Defendants argue that after Dep. Canfield reentered the residence, all subsequent entries and evidence were tainted by the violation. The Government argues the names of co-conspirators and evidence collected from the execution of the search warrant by Det. Nolan would have been discovered in time from independent sources.

Det. Nolan testified he was advised by Det. Rodrigo that he was called out by the road deputies who had arrested someone on a warrant and observed drug paraphernalia inside the house. (Vol. I, 210:10-13). Det. Rodrigo told him they had found Oxycodone pills and prescriptions and blank prescription forms, along with needles and ledgers. (Vol. I, 210:14-16). He did not speak with any of the other deputies at that time. (Vol. I, 212:9-14).

After Det. Nolan spoke with Det. Rodrigo, he spoke to Defendant Carey Bergin to find out if there was anyone else in the apartment. (Vol. I, 211:17-22). Although Defendant Carey Bergin gave him permission to search the residence, he decided to get a search warrant, and entered the residence to clear it, prior to getting the warrant. (Vol. I, 211:21-25, 212:1-9, 215:8-13). Det. Nolan noticed paraphernalia and other items in plain view as he cleared the residence. (Vol. I, 215:17-19).

Det. Nolan received his information from Det. Rodrigo who entered the residence with the consent of Defendant Carey Bergin. As noted earlier, Det. Rodrigo had Defendant Carey Bergin open the safe and discovered Oxycodone pills, false prescription pads, and other information related

to the alleged illegal drug operation. Sgt. Magas also debriefed Det. Rodrigo on the events that took place at the residence prior to his arrival. (Vol. I, 167:10-22). Sgt. Magas advised Det. Rodrigo that Deps. Canfield and Roberts had arrived at the residence to arrest Defendant Jason Bergin on a warrant and found drug paraphernalia with drugs inside the room and possibly more drugs inside a safe. (Vol. I, 167:19-22). This information was used to obtain the search warrant by Det. Nolan.

The Defendant does not challenge the search warrant *per se* but only the fact that the information used to obtain the warrant was tainted by Dep. Canfiled's reentry into the residence. The Court has previously found that Dep. Canfield's initial entry into the residence was not tainted by his reentry into the residence. Based upon the hearing testimony, there was legally obtained information from three different officers that established sufficient probable cause that criminal activity was taking place in the residence.

Thus, the Court respectfully recommends the Motion to Suppress any evidence gathered as a result of the search warrant should be denied.

### *(7) Whether Defendant Carey Bergin's Statements Should be Suppressed*

Defendant Carey Bergin contends her statements should be suppressed because they were derived from the officers' illegal search and seizure of the residence and that she was most likely high on drugs when she made her statements. The Government responds that Defendant Carey Bergin's statements would have been taken regardless of any taint and she was properly read her Miranda rights on three (3) different occasions and each time gave a statement without invoking her rights.

Miranda v. Arizona, requires that before a defendant in custody can be interrogated that the Defendant be informed of: (1) the Defendant's right to remain silent; (2) that statements can and will

be used against them in a court of law; (3) that the Defendant has the right to an attorney during questioning; and (4) that if the Defendant cannot afford an attorney one will be appointed. 384 U.S. 436, 478-479, 86 S. Ct. 1602, 16 L. Ed. 694 (1966). Under Miranda, custody is the depravation of freedom of action normally associated with an arrest. Id. at 444. The initial determination of custody depends on the objective circumstances of interrogation and not on the subjective views harbored by either the officer or the Defendant. Stansbury v. California, 511 U.S. 318, 323, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) (*per curiam*).

The Defendant argues from Wong Sun v United States, 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (quotation marks omitted), that the exclusionary rule generally bars the admissibility at trial of tangible evidence as well as verbal statements acquired through unconstitutional means. The Defendant continues that not only primary evidence discovered as the result of the illegal seizure, Weeks v U.S., 232 U.S. 383, 34 S. Ct. 341, (1914), but also the evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree. Segura, 468 U.S. at 804.

It is true that Miranda warnings do not, without more, dissipate the taint of an illegal seizure. U.S. v Santa, 236 F. 3d 662, 678 (11th Cir. 2000). However, in this instance, the Court has found that Dep. Canfield's initial entrance into the residence did not violate the Fourth Amendment. Since the investigation at the Bergin Defendants' residence that night stems from that initial entry by Dep. Canfield, followed by the consensual search performed by Det. Rodrigo, and the subsequent search warrant obtained by Det. Nolan, there is no taint to Defendant Carey Bergin's statements.

The fact that her statements were voluntarily made is bolstered by the fact that she agreed to talk to officers on at least three (3) separate occasions after she was read her Miranda rights, and at

no time did she refuse to talk to officers without an attorney present. She was cooperative in speaking with Det. Rodrigo while at the scene on July 28, 2009 and was interviewed post-<u>Miranda</u> by Det. Nolan on that date as well. Further, in a second interview, Agent Baginski read Defendant Carey Bergin her Miranda rights and spoke with her after the federal indictment was returned on September 22, 2009. (Vol. II, 365: 4-12). Defendant Carey Bergin told Agt. Baginski that she understood her rights and elected to waive her rights at that time. (Vol. II, 365:25, 366: 1-6). Agt. Baginski described Defendant Carey Bergin as very cooperative. (Vol. II, 365:10-12). Moreover the September interview was clearly separated in time from Dep. Canfield's entry into the residence to clear any alleged taint that may have been caused by the reentry.

While the Defendant argues that she may have been under the influence of narcotics because of her addiction, Det. Nolan testified that she appeared to be coherent and was not slurring her words, and Agt. Baginski testified that she did not appear to be under the influence of any drugs or alcohol at the time she was read her <u>Miranda</u> rights in September. (Vol. I, 264:11-18, Vol. II, 366:7-9). Defendant Carey Bergin's argument that she may have been under the influence and unable to render a voluntary decision lacks merit, as the testimony establishes that she was coherent and cooperative.

Thus, the Court respectfully recommends the Defendant Carey Bergin was read her <u>Miranda</u> rights and voluntarily agreed to and that her statements were not tainted by the events that occurred at the residence on July 28, 2009.

## CONCLUSION

A review of the evidence demonstrates that Dep Canfield was given permission to enter the residence by Defendant Jason Bergin. Once inside, he saw drug paraphernalia in plain view and then

called his supervisors. Det. Rodrigo clearly had Defendant Carey Bergin's consent and assistance to enter the residence and search the safe. Det. Nolan used the information gathered during the early morning hours of July 28, 2009, to obtain a search warrant even though he had Defendant Carey Bergin's consent to enter and search the residence. Defendant Carey Bergin subsequently gave statements at the scene and approximately a month later regarding her involvement and the involvement of others in the conspiracy to use false prescriptions to obtain narcotics.

Thus, based upon the evidence presented over two days of testimony, the memoranda of law and the arguments of counsel, the Court respectfully recommends that the Defendant Jason Bergin's Motion to Suppress as adopted by the Defendants Carey Bergin and Robert Powner should be denied. Accordingly, it is now **RESPECTFULLY RECOMMENDED:**

(1) The Defendant Jason Bergin's Motion to Suppress Evidence (Doc. # 92) should be **DENIED**.

(2) The Defendant Robert Powner's Motion to Suppress Evidence as Adopted (Doc. # 110) should be **DENIED**

(3) The Defendant Carey Bergin's Motion to Suppress Evidence as Adopted (Doc. # 151) should be **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully Recommended** at Fort Myers, Florida, this _____26th_____ day of March, 2010.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record